```
IN THE DISTRICT COURT OF THE UNITED STATES
       FOR THE DISTRICT OF SOUTH CAROLINA
              SPARTANBURG DIVISION
```

| | |
|---|---|
| Gary G. Harris, ) | |
| ) | Civil Action No. 7:08-3020-HFF-KFM |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER AND** |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| Tietex International, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 68) and motion to strike (doc. 111). In his complaint, the plaintiff alleges that the defendant, his former employer, violated the Age Discrimination in Employment Act ("ADEA")[1] by terminating his employment and replacing him with a younger individual. He further alleges the defendant violated the ADEA by retaliating against him for complaining about age discrimination toward other employees. He also alleges state law claims against the defendant for breach of contract, breach of contract accompanied by a fraudulent act, and defamation.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The plaintiff was terminated from employment with Tietex International, Ltd., at the age of 62. The plaintiff began working at Tietex on July 13, 1994, as a Senior Research Chemist. (*Id.* 57-61, ex. 6-7, 15). Prior to February 1, 2007, the plaintiff reported

---

[1]In his response in opposition to the motion for summary judgment, the plaintiff implies that the defendant may have violated the Americans With Disabilities Act. (Pl. resp. m.s.j. 15). However, no such claim was alleged in his complaint, and thus it will not be addressed here.

to Jake Butts. The plaintiff's normal working hours were 8:00 a.m. to 5:00 p.m., but he claims he was often at work by 6:00 or 6:30 a.m. and stayed later than 5:00 p.m. (Pl. dep. 74-75). On occasion, the plaintiff stayed until 8:00, 9:00, or 10:00 at night. (*Id.* 77). The plaintiff admits he was the only employee who did lab work after hours and that he left messages for managers when he knew they would not be answering their phones. (*Id.* 81-82, 126-27, ex. 10, 14; Wallace decl. ¶¶ 20-21). Mr. Butts testified that the plaintiff worked "odd" hours but he "didn't worry about [the plaintiff's] timekeeping … [and] always felt that [the plaintiff] had a good work ethic. He's certainly, in my opinion, a brilliant chemist and could accomplish the things that needed to be accomplished. And when I've asked him to work on a specific thing, he's been able to do what I needed him to do." (Butts dep. 47, 59).

Mr. Butts relocated his office from the plant to the office area of the technical building, where the plaintiff's office was located. Soon after Mr. Butts relocated his office, the plaintiff claimed he noticed a mold smell and had symptoms of congestion, sinus headache, and flu. The plaintiff claimed that the smell originated from Jake Butts' clothing and the furniture Mr. Butts moved into his relocated office. After some time and several visits to doctors, including an ENT and allergist, the plaintiff contended that the smell was the source of his illness due to an allergy to mold. The plaintiff reported his belief to Mr. Butts. The defendant hired a hygienist to perform testing in the lab. The hygienist reported that there was no mold contamination and that the air in the lab was cleaner than the outside air. Although the plaintiff claims the testing was flawed, he admits he has no evidence of that. His only specific complaint about the testing was that it did not focus solely on the office area of the lab, but tested all four sections of the laboratory. (Pl. dep. 87- 89, 91-94; Wallace decl. ¶ 12). At some time in late 2006, the plaintiff established a second office in the main plant. He continued to do work in the lab until February 2007. (Pl. dep. 87-88). According to the plaintiff, he was not bothered by the allergy when he spent short periods of time in the lab area. (Pl. aff. ¶ 7).

2

Effective February 1, 2007, the plaintiff was placed under the supervision of Wade Wallace. The defendant argues this was in part due to the plaintiff's continued complaints about the smell associated with Jake Butts. The plaintiff believes the reason for the change in his reporting relationship was so that Mr. Wallace could assist him in getting more involved with special projects. The defendant agrees that this was also a factor in the decision to place the plaintiff under the supervision of Mr. Wallace. (Pl. dep. 101-103; Wallace decl. ¶¶ 5-6).

Between February 2 and 5, the plaintiff and Mr. Wallace discussed by e-mail whether the plaintiff would be able to continue working in the lab because of his continued complaints about the mold smell. Mr. Wallace stated the defendant would "do whatever [was] necessary to shield [the plaintiff] from any further exposure to an environment(s) that might negatively impact [his] health," and he instructed the plaintiff to wear a mask when he worked in the lab. However, the plaintiff decided that the mask would not give him enough protection. Mr. Wallace then told the plaintiff not to enter the lab under any circumstances. Mr. Wallace reminded the plaintiff to give him a list of items he would need to do his job outside the lab, and Mr. Wallace would have them relocated for the plaintiff. Thereafter, the plaintiff asked if he could work in the lab if he signed a waiver. Mr. Wallace rejected the waiver stating that it "was still unacceptable from an HR/company liability perspective since [the defendant] would be allowing [the plaintiff] to come in contact with an environment that might negatively affect [his] health. Equipment was purchased to accommodate the plaintiff's needs outside of the lab. However, the plaintiff claims that the equipment was not put into place because there was always a problem with "where [the equipment] was going to go." The plaintiff also asked if he could work on Saturdays and Sundays. Mr. Wallace told him that he could work in the plant anytime the plant was operational, and he could come into the facility to do office work when the plant was down. The plaintiff was told not to operate any lab equipment in a lab setting when the plant was down and no other

3

employees were present. Mr. Wallace told the plaintiff that if he had to do lab work after regular business hours he should do it on weekday evenings when the second shift was operating. (Pl. dep. 95, 101, 112-13, 122-23, ex. 12, 17; Wallace decl. ¶¶ 13-17).

On February 7, 2007, the plaintiff told Mr. Wallace that he was overwhelmed by personal and emotional problems that had occurred in his personal life over the past year, and he was having difficulty functioning. The plaintiff testified that his wife was ill during this time period. Dealing with his wife's illness left him stressed with major sleep disturbances. He testified he was a "wreck" because of his wife's illness. Mr. Wallace told the plaintiff that the company "would support him if he felt he needed to utilize EAP," but the plaintiff stated that was not necessary. (Pl. dep. 106-107, 111, ex. 13, 44; Wallace decl. ¶ 18).

According to Mr. Wallace's deposition testimony, the plaintiff complained to him in February 2007 that he did not feel he was being treated fairly. According to Mr. Wallace, the plaintiff "felt like Tietex, in general did not value him, did not recognize him and did not utilize his skills in a way that he thought that they should." The plaintiff further complained that he "had not been promoted in a manner in which he felt was acceptable, and his compensation had not grown in a manner which he felt was acceptable." Mr. Wallace further testified that the plaintiff "never mentioned age." (Wallace dep. 84).

On February 22, 2007, the plaintiff left voice mail messages for both Mr. Wallace and Tietex's owner, Martin Wildeman, at 3:00 a.m., complaining about his inability to sleep, and about unspecified work-related issues. The plaintiff expressed concern about being moved from the lab and that he was "still not set up to easily do his bench work." The plaintiff asked for a lab pad coater and a vented hood. Mr. Wallace stated that he would take time to locate, acquire, and install the equipment, but stated that in the meantime the plaintiff could use the equipment in the beam/dye area, and/or coordinate to use Robert Culbreth, a chemical technician, to perform work for him in the lab. (Pl. dep. 111-12, ex. 14;

4

Wallace decl. ¶¶ 14, 16, 20). The plaintiff believes that the defendant was motivated to keep him out of the laboratory to avoid liability for any health problems he might experience rather than out of a real concern for his health. (Pl. dep. 123). Importantly, the plaintiff does not assert that the defendant was motivated to keep him out of the lab because his age.

The plaintiff also complained about being required to stay involved with environmental reporting and stated he was concerned about completing an environmental report that was due March 1, given his other projects. Mr. Wallace stated in an e-mail to David Wilson, the Human Resources Manager, and Mark Isbell, the Vice President of Operations, that he saw "no reason that [the plaintiff's] projects would interfere with his ability to get this report done on time." Mr. Wallace further stated that he "made this clear" to the plaintiff. The plaintiff admitted in his deposition that it was reasonable for Mr. Wallace to expect him to complete the environmental report on time. Mr. Wallace also asked the plaintiff to come to him directly with issues before going to Mr. Wildeman. (Pl. dep. 113, ex. 14, 15; Wallace decl. ¶ 23).

On March 5, 2007, Mr. Wallace discussed several issues with the plaintiff regarding his performance and documented the discussion at the plaintiff's request in a memorandum to David Wilson, with a copy to Mark Isbell and the plaintiff. Mr. Wallace noted the plaintiff made emotional and overly vocal accusations and statements without supporting research or data, was not honoring the chain of command, harbored grudges over past grievances and toward the management in general, and complained about ownership of environmental reporting duties. The memorandum concluded with the statement, "As we discussed these issues are not sustainable and it is mandatory that Gary make significant progress towards resolving these issues within the next 30 days." (Pl. dep. 117-18, ex. 16; Wallace decl. ¶ 25).

On June 18, 2007, Mr. Wallace had another discussion with the plaintiff regarding his work performance. Mr. Wallace documented the discussion in a

memorandum to the plaintiff, with a copy to David Wilson and Mark Isbell. The discussion focused on two projects for which the plaintiff was responsible: (1) the development and qualification of a Tietex coating compound as a replacement for the coating that was currently being used on C237 ("C237 Project"); and (2) the development of a finish formula and process for parabolic application of T602 ("T602 Project"). (Pl. dep. 128-30, ex. 18; Wallace decl. ¶ 26).

The plaintiff had been working on the C237 Project for about six months. The plaintiff had predicted that the C237 Project would result in significant cost savings for the defendant. The plaintiff claimed he had a successful trial before he began reporting to Mr. Wallace. Despite the plaintiff's characterization of the compound he created as a success, it was unacceptable to the defendant because it was much more complicated to produce commercially than the plaintiff had initially promised. In February, Mr. Wallace began working separately on a parallel C237 Project because it appeared that the plaintiff would fail to achieve the cost savings he had predicted. Eventually, the situation was resolved by the provider lowering its price. (Pl. dep. 131-34, ex. 18; Wallace decl. ¶ 27).

Because of the expense, a plant production trial is done only if laboratory production is successful. The plaintiff told Mr. Wallace that the lab samples for the T602 project were promising and recommended a production trial. According to the plaintiff, the first plant production trial showed mixed results with some samples that were "not good," but others that were "comparable," depending on the amount of finish. However, the plaintiff told Mr. Wallace that, based on the results, another plant production trial was warranted. On the plaintiff's recommendation, a second plant production trial was performed, which was unsuccessful. A third trial was similarly unsuccessful. When the second and third trials failed, Mr. Wallace reviewed the results of the first plant production trial himself. Mr. Wallace testified that the results of the first trial had not been as the plaintiff portrayed them,

so the second and third trials were unwarranted based on the results of the first. (Pl. dep. 135-41, 295, ex. 18; Wallace ¶¶ 28-32).

Mr. Wallace cited the plaintiff for his poor analytical practices and instructed him to improve his performance within 30 days. The plaintiff considered this his final written warning. (Pl. dep. 139, 141, ex. 18; Wallace decl. ¶ 32).

According to Mr. Wallace, the plaintiff made no effort to complete the C237 project. Instead, the plaintiff began taking multiple days of vacation immediately after being given the warning on June 18. These vacation days were frequently taken on short notice. Sometimes, the plaintiff waited until the day before to notify Mr. Wallace. Other than the environmental reporting, the plaintiff had not improved on the issues cited in the memorandum of March 5, 2007. Gate records and management observation showed that the plaintiff had continued to ignore the directive not to work in the chemical lab areas at nights or on the weekends. The same records showed inconsistent work hours and erratic patterns of entry and exit to and from the facility. The plaintiff's co-workers complained that he did not return calls or e-mails consistently, disrupting their work patterns. (Pl. dep. 145-48, ex. 19, 20; Wallace decl. ¶¶ 33-36).

The plaintiff was scheduled to fly to Indiana on June 14 to visit a customer and return on June 15. After flying the first leg of his trip, the plaintiff turned around and came home because he had a headache. (Pl. dep. 148-49). According to Mr. Wallace, the plaintiff never told him he had not met with the customer in Indiana. (Pl. dep., ex. 19; Wallace decl. ¶ 37).

On the evening of Monday, July 2, after work, the plaintiff left a voicemail message for Mr. Wallace, telling him that he had an ant infestation at his house. The plaintiff said he would take care of the ants first thing the following morning and then go to Hexion, a chemical facility, and work on a project. (Pl. dep. 151-52). Since the plaintiff left this message after work hours, Mr. Wallace did not hear the message until the morning of

7

Tuesday, July 3, 2007. (Pl. dep., ex. 19; Wallace decl. ¶ 38). The plaintiff called Mr. Wallace and left a second voicemail message around 9:00 a.m., saying he had resolved the ant problems and was going to work at Hexion. According to the plaintiff, he needed sulfuric acid to do testing. The plaintiff did not arrive at Hexion until 1:30 p.m. The plaintiff could not enter Hexion because he could not contact anyone he knew there to gain entry. The plaintiff estimates he was at Hexion between 30 minutes to an hour and a half. The plaintiff claims that after leaving Hexion, he drove around for 30 to 45 minutes looking for Chemurgy, another chemical facility. When the plaintiff located Chemurgy, no one was there, so he did not stay. (Pl. dep. 154-60, ex. 21; Wallace decl. ¶ 39).

The plaintiff left a message for Hexion employee Pam Westmoreland, telling her that he could not get into the laboratory. The plaintiff stated in his message that he needed a small sample of sulfuric acid, and he would come back and pick it up. Hexion employee George Henderson told Ms. Westmoreland that he would take the sample to the plaintiff at Tietex on his way home. (Pam Westmoreland aff. ¶¶ 5-9).

The plaintiff did not telephone Mr. Wallace to tell him that he could not get in Hexion and that he was going to Chemurgy or anywhere else. (Pl. dep. 160; Wallace decl. ¶ 48). The plaintiff admits it would have been reasonable for him to call Mr. Wallace and tell him that his plans had changed. (Pl. dep. 165).

George Henderson, the Hexion employee, brought the sulfuric acid to Tietex for the plaintiff. Mr. Wallace later called Mr. Henderson and asked if he had seen the plaintiff that day, but Mr. Henderson had not. Mr. Henderson said that he had a voicemail from the plaintiff saying he needed some sulfuric acid urgently because he was planning to do some work on July 4th. According to Mr. Wallace, he was troubled because the plaintiff was not where he said he would be and because it appeared the plaintiff had planned to work with chemicals in the lab on a day the plant was supposed to be closed. (Pl. dep. 160; Wallace ¶¶ 42-43).

Mr. Wallace called the plaintiff on his cell phone between 4:30 p.m. and 5:00 p.m. and asked where he was. The plaintiff told Mr. Wallace that he had been to Hexion. Mr. Wallace told the plaintiff that Mr. Henderson had been to Tietex and said that the plaintiff had not been at Hexion that day. The plaintiff then stated he had gone to Hexion, but had been unable to get in or find anyone, so he left. The plaintiff could not give Mr. Wallace an adequate explanation of his whereabouts for the day. Mr. Wallace told the plaintiff he was suspended until Mr. Wallace returned from vacation. During the phone call, the plaintiff and Mr. Wallace were disconnected, and Mr. Wallace could not reach the plaintiff again by telephone. Mr. Wallace talked to David Wilson, the Human Resources Director, about what transpired, and a voice mail message was left for the plaintiff reiterating that he was suspended with pay and should not return to work until contacted by the defendant. (Pl. dep. 158-66, ex. 19; Wallace ¶¶ 44-48).

Mr. Wallace conducted an investigation of the events of July 3 when he returned from vacation. Mr. Wallace recommended the plaintiff's employment be terminated, and the decision to do so was made by Mr. Wallace; David Wilson, Human Resources Director; Martin Wildeman, Owner; Reed Cunningham, President; and Mark Isbell, Vice President of Manufacturing. The plaintiff was told he was not being terminated for one specific deficiency, but for many shortcomings that "added up," including the issues Mr. Wallace had addressed with him in the March 5, 2007, memorandum. (Pl. dep. 142, ex. 16; Wallace decl. ¶¶ 48-50). These issues were also documented in a memorandum dated July 18, 2007. (Pl. dep., ex. 19; Wallace decl. ¶ 51). The plaintiff's employment was terminated on July 19, 2007. The plaintiff does not know who made the decision to terminate his employment. (Pl. dep. 167-68, ex. 22).

9

## APPLICABLE LAW AND ANALYSIS

*Motion to Strike*

The defendant has moved to strike several paragraphs in the plaintiff's affidavit submitted in opposition to the motion for summary judgment, arguing they contain assertions that lack personal knowledge, are conclusory, are based on unsupported personal opinion or speculation, are based on hearsay, or contradict the affiant's own prior sworn deposition testimony or documentary evidence. The paragraphs pertinent to the court's analysis of the motion for summary judgment are discussed below.

*Motion for Summary Judgment*

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

### *ADEA*

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2352 (2009). The evidence may be direct or circumstantial. *Id.* at 2351.

11

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995), *abrogated on other grounds by*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The plaintiff attempts to establish direct evidence of age discrimination based on a single statement allegedly made by Reed Cunningham, Tietex's President. The plaintiff claims that sometime before 2001 Mr. Cunningham commented that Tietex must get younger people into management. The plaintiff admits that it is quite reasonable to conclude that Mr. Cunningham did not mean he wanted the younger people to replace older workers, but believed the company needed a succession plan so that Tietex would have the ability to replace workers who either retired or left the company. The plaintiff admits Mr. Cunningham's comment was casual and confesses that, "[a]nd in all fairness to him, I personally don't think he meant anything by it…" The plaintiff admits he never complained to anyone about the statement. (Pl. dep. 187-88).

In his affidavit submitted in opposition to the motion for summary judgment, the plaintiff stated, "These incidents mirror the age-based animus voiced to me in 2000 by a high level manager Reed Cunningham about his plan to replace older managers with younger ones." (Pl. aff. ¶ 8). As argued by the defendant in its motion to strike, this statement contradicts the plaintiff's deposition testimony that the comment was casual and he did not think Mr. Cunningham meant anything by it. (Pl. dep. 187). If an affidavit conflicts with earlier sworn testimony, it must "be disregarded as a sham issue of fact." *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 975 (4th Cir. 1990). "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984). Based upon the foregoing, the defendant's motion to strike this portion of paragraph 8 of the plaintiff's affidavit is granted.

In *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542 (4th Cir. 1995), *rev'd on other grounds by*, 517 U.S. 308 (1996), a supervisor's remarks that, "[I]t's about time we get some young blood in this company," and "[Y]ou are too damn old for this kind of work," were insufficient evidence of discrimination because the remarks were not made in the context of replacing the plaintiff, but were made in another or an unknown context. *Id.* at 548-50. In *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994), a supervisor commented, "there comes a time when we have to make way for younger people." *Id.* at 511. The court noted that "[i]t is undisputed that the statement was made over two years before the discharge of [the plaintiff]. This remoteness in time makes it inappropriate to use . . . the statement as evidence of age discrimination." *Id.* at 511-12. The court further found "the statement in itself creates no inference of age bias. [The] comment reflects no more than a fact of life and as such is merely a 'truism[ ]' that carries with it no disparaging undertones." *Id.* at 512.

The comment here is similar to those in *O'Connor* and *Birkbeck*. This court agrees with the defendant that this comment, made over six years before the plaintiff's termination of employment and in no way related to his termination, cannot evidence any intent to discriminate against the plaintiff because of his age.

Under the burden-shifting method of proof of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[2] a plaintiff may establish a *prima facie* case of age discrimination under the ADEA by showing that he (1) is a member of the protected class, i.e., is at least 40 years old; (2) suffered an adverse employment action; (3) was meeting his employer's legitimate expectations at the time of the adverse action; and (4) was replaced

---

[2]The Supreme Court recently found that the text of the ADEA does not authorize a mixed-motive age discrimination claim. *Gross*, 129 S.Ct. at 2350. The Court also noted that it "has not definitively decided" whether the *McDonnell Douglas* framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." 129 S.Ct. at 2349 n.2. Accordingly, this court must follow Fourth Circuit precedent, which applies the *McDonnell Douglas* framework to ADEA claims. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004). *See also Misner v. Potter*, 2009 WL 1972598, *2 n. 3 (D. Utah 2009) ("This court does not understand *Gross* as altering the use of the *McDonnell Douglas* framework at summary judgment on ADEA cases.").

13

by or treated less favorably than someone who is either outside the protected class or "substantially younger" than he is. *Mandengue v. ADT Security Systems, Inc.*, C.A. No. RDB-09-3103, 2010 WL 2365463, *5 (D. Md. 2010).

If the plaintiff can establish a *prima facie* case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981) (this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

The plaintiff is over 40 years old, and he suffered an adverse employment action when he was fired by the defendant. The defendant, however, argues the plaintiff cannot establish the third and fourth elements of a *prima facie* case.

First, the defendant argues the plaintiff was not performing his job at a level that met the defendant's legitimate expectations. This court agrees. As set forth above, the defendant articulated the deficiencies in the plaintiff's performance in memoranda dated March 5, June 18, and July 18, 2007. (Pl. dep., ex. 16, 18, 19). The plaintiff attempts to contradict the defendant's dissatisfaction with his performance by his subjective assessment of himself as a valuable, outstanding, and exemplary performer. However, the plaintiff's subjective view of his performance does not establish a *prima facie* case. *See McNally v. Norton*, 498 F.Supp.2d 167, 183 (D. D.C. 2007) ("Plaintiff's subjective belief of qualification is not evidence that can be used to establish that he was qualified for the job.") (citation omitted). The perception of the employer is critical, "not the self-assessment of the plaintiff." *Hawkins v. PepsiCo*, 203 F.3d 274, 280 (4th Cir. 2000) (citation omitted).

Next, the defendant argues that the plaintiff has no evidence he was replaced by a person substantially younger than himself. The plaintiff contends that "Wallace . . . became determined to rid Tietex of [the plaintiff] and replace him with a twenty-five year old

14

worker who was referred to Tietex by Wallace's boss, Mark Isbell." (Pl. resp. m.s.j. 16, ex. 8). The employee referred to by the plaintiff is Trish Guzman. However, as pointed out by the defendant, the plaintiff does not deny that Ms. Guzman's title of Chemist Lab Manager and his title of Senior Research Chemist were different. He also does not dispute that Ms. Guzman's job description as Chemist Lab/Environmental Manager is not an accurate description for the job he performed and is much smaller in scope. The plaintiff can only point to a few of his former duties that he claims Ms. Guzman performed. He claims Ms. Guzman dealt with vendors and formulations in an effort to purchase chemicals for less. (Pl. dep. 192-93). Ms. Guzman performed only a few of the general chemical duties that had previously been a portion of the plaintiff's job. (Wallace decl. ¶ 52). The plaintiff himself also claims another employee, Colon Knight, "replaced him to a certain extent." (Pl. dep. 224). Mr. Wallace testified that after the plaintiff was terminated several people performed his prior duties: Mr. Wallace did the project work; the evaluation and approval of all new chemicals was put on hold, so no one performed those duties; Jake Butts was reassigned some of the environmental work; and some environmental duties were later assumed by Paul Hite. (Wallace dep. 122-23; Butts dep. 34-36). Mr. Wallace testified that Ms. Guzman was later hired and took on two or three of the plaintiff's former duties. Further, Ms. Guzman did not report to Mr. Wallace, as the plaintiff had. (Wallace dep. 124).

The plaintiff also alleges that the defendant "replaced numerous older employees with younger employees." (Comp. ¶ 4). In his response in opposition to the motion for summary judgment, the plaintiff argues as follows:

> Over the past few years at Tietex, management has engaged in a pattern and practice of replacing older managers with younger ones. Judy Kramer was a lab manager aged approximately sixty-two (62). She was replaced by Rhonda Blanchard who was aged thirty (30) or younger. Bill Lynch was a sixty (60) year old Gray Mill operator, he was replaced by Joey Griffin, who was in his thirties (30s). Leroy McCraw was a sixty year old engineer who was pushed out by Tietex, given a severance and some "consulting" work and then was replaced by Paul Bartley, an engineer in his thirties (30s). Jake Butts,

15

>           sixty-six (66) at time of discharge, was given a severance the
>           month after Harris was terminated. He was replaced by Colin
>           Knight, in his thirties (30s).

(Pl. resp. m.s.j. 16). In his affidavit submitted in opposition to the motion for summary judgment, the plaintiff makes similar allegations. (Pl. aff. ¶ 8). However, the plaintiff's affidavit directly contradicts his prior testimony in his deposition that (1) Judy Cramer retired, and the plaintiff, himself, chose Rhonda Blanchard to replace her; (2) he did not know if Bill Lynch was terminated and replaced with Joey Griffin; and (3) he denied that Leroy McCraw was terminated because of age and replaced with Paul Bartley. (Pl. dep. 201-206). Further, the plaintiff's affidavit contradicts Jake Butts' deposition testimony that he retired voluntarily with an incentive package. (Butts dep. 8-9). The plaintiff admitted in his deposition that he was not sure that Mr. Butts had been replaced because of his age, and he had no evidence that he was. (Pl. dep. 206). Accordingly, as paragraph 8 of the plaintiff's affidavit conflicts with earlier sworn testimony, it is stricken. *See Rohrbough*, 916 F.2d at 975.

This court finds that the plaintiff has failed to establish a *prima facie* case of age discrimination. The defendant has produced evidence showing it had legitimate, non-discriminatory reasons for firing the plaintiff. (Pl. dep., ex. 16, 18, 19; Wallace decl.). Even assuming the plaintiff could establish a *prima facie* case of age discrimination, he has failed to show that the proffered reasons for his termination of employment were pretext for age discrimination as set forth below.

The plaintiff points to several "material disputes of fact" that he argues shows age discrimination was the reason for his termination of employment. First, the plaintiff notes "[g]ross inaccuracies in Wallace's timeline testimony" with regard to the events of July 3, 2007. (Pl. resp. m.s.j. 12). Specifically, the plaintiff contends Mr. Wallace "relates a totally inaccurate timeline as to when the Hexion representative was at Tietex." Also, the plaintiff contends Mr. Wallace "made false statements in the termination memo" by wrongly stating that the plaintiff instructed the Hexion employee to deliver the sulfuric acid to Tietex.

(Pl. resp. m.s.j. 12). Assuming the plaintiff is correct, it is unclear how these facts are material to the issue of whether the plaintiff was terminated because of his age. As argued by the defendant, the Hexion employee's visit to Tietex is relevant only to the extent that it is what alerted Mr. Wallace to the fact that the plaintiff was not working at Hexion as he said he would be. Here, even assuming Mr. Wallace was motivated to terminate the plaintiff's employment based on an incorrect fact (that is, the timeline or whether the plaintiff asked the Hexion employee to deliver the sulfuric acid), this does not equate to being motivated by age.

The plaintiff next contends that Jake Butts' opinion of the plaintiff's performance and work hours is evidence that Mr. Wallace manufactured these performance deficiencies. While Mr. Butts testified that he did not have a problem with the plaintiff's "odd" work hours or performance, it is clear that Mr. Wallace did. However, the plaintiff has presented absolutely no evidence that Mr. Wallace's expectations of the plaintiff were motivated by age. Establishing "new, higher standards raises no suspicion of discrimination by itself; the courts must accept the employer's legitimate standards of qualification 'provided the decision is not based upon unlawful criteria.'" *Bossalina v. Lever Brothers, Inc.*, No. 86-2158, 1988 WL 60572, *2 (4th Cir. 1988) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981)).

Based upon the foregoing, the plaintiff has failed to show that issues of material fact remain. Accordingly, his discharge claim fails.

*Retaliation*

The plaintiff also alleged he was terminated from his employment in retaliation for his complaints about "past problems" to his former supervisor, Jake Butts. (Pl. dep. 184). Retaliation claims under the ADEA are governed by the *McDonnell Douglas* framework for circumstantial evidence, requiring the plaintiff to establish a *prima facie* case showing: (1)

he engaged in protected activity; (2) the defendant took adverse action against him; and (3) a causal connection existed between the protected activity and the adverse action. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 191 (4th Cir. 2001). Protected activity may be in the form of participation in the charge filing process or protesting unlawful age discrimination in the work place. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

The plaintiff claims he stated to his former supervisor, Jake Butts, in 2004 or 2005 that older workers seemed to be replaced by younger workers and that this concerned him. The plaintiff was terminated from employment on July 19, 2007. The plaintiff admits that Mr. Butts was not in a position to influence his employment status at the time of his termination from Tietex. He further admits he has no evidence that Mr. Butts told anyone about his conversation with the plaintiff, and no one else was present. The plaintiff testified that his only evidence that he was retaliated against was the fact that he was terminated. (Pl. dep. 180-84, 207, 210).

The plaintiff has absolutely failed to show any causal connection between the statements made to Mr. Butts and his termination. The two events are not closely related in time, there is no evidence anyone other than Mr. Butts was aware of the statements, and Mr. Butts had no influence or involvement in the plaintiff's termination from employment.

The plaintiff argues in his opposition to the motion for summary judgment that he met with Tietex's owner, Martin Wildeman, on June 21, 2007, "to address the discrimination and other problems he was experiencing with…Wallace." (Pl. resp. m.s.j. 5). He cites to his own affidavit submitted in support of his opposition memorandum. In that affidavit, the plaintiff states in pertinent part, "Specifically, on June 21, 2007, just two weeks before I was suspended, I met with Martin Wildeman, and addressed the issues of . . . 2) Discrimination . . . . Clearly, I reported discrimination right before I was fired to the highest authority at Tietex - the owner." (Pl. aff. ¶ 5). In his affidavit, the plaintiff cites a document that he created listing bullet points including "Discrimination" for a meeting with "Martin" on

18

June 22, which is marked through and replaced with June 21. The plaintiff's own handwritten notes on the document characterize the list as "topics I *would* go over." (Pl. aff., ex. D) (emphasis added). The plaintiff further states in his handwritten notes on the document, "I recall very little about what was discussed. I do recall that the owner refused to get into discussion, was of no support and aborted the meeting rather suddenly." (*Id.*). In his deposition testimony, the plaintiff testified that he could not recall ever having mentioned age discrimination to Mr. Wildeman. (Pl. dep. 176-78). The plaintiff confirmed on the document that Mr. Wildeman "was not provided a copy of this listing", so Mr. Wildeman did not even know that "Discrimination" was to a be a "topic" of discussion. (Pl. aff., ex. D). Based upon the foregoing, the plaintiff has provided no evidence he discussed discrimination with Mr. Wildeman. Further, as the statement in the plaintiff's affidavit is conclusory, not factual, and contradicted by the document he relies upon and his earlier sworn deposition testimony, this court grants the defendant's motion to strike this portion of paragraph five of the plaintiff's affidavit.

The plaintiff also contends he was not terminated until after he made "final complaints of mistreatment" on July 18, 2007. (Pl. resp. m.s.j. 9). The plaintiff cites to Human Resource Director David Wilson's testimony before the South Carolina Employment Security Commission that he allowed the plaintiff to "vent" prior to his termination. However, Mr. Wilson makes no reference to the plaintiff mentioning age discrimination or age in any way. (*Id.*, ex. 19 at 22-23). In his response to the motion for summary judgment, the plaintiff does not allege that he complained he was being discriminated against because of his age, only that, in his view, he was being treated unfairly. (Pl. resp. m.s.j. 9). As noted by the defendant, many people who are about to be terminated from their employment believe they are being treated unfairly, but expressing that feeling is not protected activity. *See* 29 U.S.C. § 623(d).

19

In summary, the plaintiff has absolutely failed to show any causal connection between the statements made to Mr. Butts and his termination. The plaintiff admitted he cannot remember discussing age discrimination with Mr. Wildeman. Further, he never used the term "age" or "discrimination" when describing his "venting" to Mr. Wilson, only that he was being treated unfairly. In addition, the plaintiff has come forward with no evidence that he complained of age discrimination to his supervisor, Mr. Wallace. Based upon the foregoing, the plaintiff's retaliation claim should be dismissed.

*State Law Claims*

As it is recommended that the plaintiff's federal claims be dismissed, the court should decline to exercise supplemental jurisdiction over the plaintiff's state law claims for breach of contract, breach of contract accompanied by a fraudulent act, and defamation. 28 U.S.C. § 1367(c); see United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

## CONCLUSION

Wherefore, based upon the foregoing,

IT IS ORDERED that the defendant's motion to strike (doc. 111) is granted in part as set forth above. To the extent the defendant moved to strike portions of the plaintiff's affidavit not discussed herein, such motion is moot. Further,

IT IS RECOMMENDED that the defendant's motion for summary judgment (doc. 68) be granted as to the ADEA claims, and that the court decline supplemental jurisdiction over the plaintiff's state law claims.

July 29, 2010  s/Kevin F. McDonald
Greenville, South Carolina  United States Magistrate Judge

20